AG–CHEM EQUIPMENT CO., INC., a
Minnesota corporation, Plaintiff,

v.

HAHN, INC., an Indiana corporation,
et al., Defendants.

No. 4–69–Civ. 317.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 9, 1972.

James P. Larkin, Larkin, Hoffman, Daly, Lindgren & Danielson, Minneapolis, Minn., for plaintiff.

Veryl F. Riddle and Daniel R. O'Neill, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for Hahn, Inc., an Indiana Corp. & Kearney-National; Patrick J. Foley, Rerat, Crill, Foley & Boursier, Minneapolis, Minn., of counsel.

Hyman Edelman, Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for Hahn, Inc., a Delaware Corp.

## MEMORANDUM DECISION AND JUDGMENT

LARSON, District Judge.

### I. FACTS

Defendant Hahn, Inc. (the defendants will hereinafter be referred to collectively as Hahn) is an Indiana manufacturer of lawn and garden equipment and a line of agricultural chemical application equipment. Hahn is one of the leading manufacturers of high clearance spraying equipment in the country and the major item in its line of chemical application equipment is the Hahn Hi-Boy, a high clearance sprayer. This machine has a distinctive and readily recognizable appearance.

Plaintiff Ag-Chem Equipment Co., Inc., (Ag-Chem) is the successor in interest of an individual proprietorship of Alvin E. McQuinn, who is plaintiff's president. In 1962, defendants approached plaintiff's president and convinced him to become the exclusive distributor of Hahn products in Minnesota. The basis of their relationship was a one year written contract. The following year plaintiff and defendants entered into another one year agreement whereby plaintiff's exclusive territory was expanded to cover northern Iowa as well as Minnesota. In 1964 a new agreement was entered into whereby plaintiff's territory was further expanded to include southern Iowa. This agreement was unwritten and was the basis for the continuing alliance from 1964 until termination of the relationship in 1968.

From 1964 until the fall of 1967 plaintiff continued to build a distribution network throughout its exclusive territory. Plaintiff's efforts resulted in its becoming defendants' leading distributor and agricultural division customer for four successive years from 1964 through 1967.

In 1967 the defendants entered into a contract to sell their products, including the Hi-Boy, to Allis-Chalmers for distribution through Allis-Chalmers dealers. Defendants sold their products to Allis-Chalmers at 55% off of list price, while giving Ag-Chem roughly 45% off. Some of the products sold to Allis-Chalmers were delivered directly to Allis-Chalmers distribution offices and warehouse facilities in Minnesota and Iowa. Although the Hi-Boys sold to Allis-Chalmers by defendants carried Allis-Chalmers decals, they were identifiable as Hahn Hi-Boys and carried the Hahn name in several locations on the machines.

Plaintiff devoted its business almost entirely to the handling of defendants' products, although Ag-Chem manufactured and distributed a supplementary line of spraying equipment of its own. Because of its heavy dependence on Hahn, plaintiff, primarily through its president, strongly protested what it believed to be defendants' violation of the exclusive provision of their agreement when sales began to be made to Allis-Chalmers. From that point the relationship between defendants and plaintiff steadily deteriorated and in July of 1968

defendants notified plaintiff that they were terminating plaintiff's distributorship. Negotiations followed. Defendants would not cease selling to Allis-Chalmers and they refused to sell plaintiff on the same terms as Allis-Chalmers; the inevitable result was institution of this suit.

After extensive pretrial preparation and twelve days of trial, four questions were submitted to the jury:

1. Did Hahn have a contract with plaintiff under which plaintiff was declared to be the exclusive distributor of Hahn equipment in Minnesota and Iowa? If so, was it breached by Hahn's sales to Allis-Chalmers?

2. Did Hahn wilfully and maliciously defame plaintiff's credit?

3. Did Hahn have good cause for terminating plaintiff's distributorship? If not, had a reasonable period for plaintiff to recoup its investment expired?

4. Did Hahn violate 15 U.S.C. § 13(a) (the Robinson-Patman Act) by selling Hi-Boys to Allis-Chalmers for less than it did to Ag-Chem?

The jury returned verdicts in favor of the plaintiff on all four Counts.[1] Hahn has moved for judgment notwithstanding the verdict or, in the alternative, for a new trial on all questions. In addition, they seek a reduction in the amount claimed by plaintiff as attorneys' fees under the Robinson-Patman Act. Finally, the defendant Hahn, Inc., a Delaware corporation, seeks to have the judgment entered against it vacated. It is these motions which are now before the Court.

## II. EXCLUSIVITY

The jury found that Ag-Chem and Hahn had entered into an agreement whereby Ag-Chem would be the exclusive dealer of Hahn equipment in Minnesota and Iowa. They further found that Hahn breached that agreement by selling Hi-Boys to Allis-Chalmers, and that as a result thereof Ag-Chem suffered damage in the amount of $98,740. Defendants claim, among other things, that there was no evidence that plaintiff was injured by breach of the exclusivity provision, and that judgment notwithstanding the verdict should be granted as to this claim. After careful review of the transcript and the briefs and arguments of counsel, this Court is inclined to agree.

Defendants' position on the exclusivity claim is premised on the theory that the measure of damages for breach of an exclusive distributorship agreement is the profit the exclusive dealer would have made on the in-territory sales of the manufacturer's products by other dealers. Under that theory, all that plaintiff would be entitled to is to be put in the same position it would have been in had Allis-Chalmers not been selling Hi-Boys. It follows, reason defendants, that since the contract was terminable at will, there can be no breach after its termination date, and the only damages allowable are any loss of profits due to Allis-Chalmers' sales prior to termination.

Plaintiff counters by urging that termination here was ineffective, since, under its theory, a party in breach of an essential covenant of an agreement cannot terminate that agreement until his or its breach has been remedied. It follows, plaintiff argues, that a purported termination is ineffective and a cause of action arises for future profits if the terminating party is in default. This it urges is an equitable doctrine which requires a party seeking to take advantage of a condition of a contract to demonstrate that he has done all that is required of him, *i. e.*, that he has clean hands.

---

1. The amount of the verdicts returned were as follows:

| | | | |
|---|---|---|---|
| Exclusivity | $ 98,740.00 | Recoupment | 104,086.00 |
| Defamation of Credit | 3,500.00 | Robinson-Patman | 91,192.00. |

It is clear that the proper measure of damages here is the profits lost due to sales in the exclusive territory by other dealers. Emerson v. Pacific Coast & Norway Packing Co., 96 Minn. 1, 104 N.W. 573 (1905); Goldman v. Weisman, 123 Minn. 370, 143 N.W. 983 (1913); Lewistown Iron Works v. Vulcan Process Co., 139 Minn. 180, 165 N.W. 1071 (1918). Here plaintiff offered no evidence of lost sales and thus no evidence of any losses caused due to sales by Allis-Chalmers. The only evidence of "exclusivity" damages offered by Ag-Chem was evidence of loss of profits after termination by Hahn.[2] Thus the question is whether future profits are recoverable after termination of a contract terminable at will.

In some situations future profits are properly allowable as damages for breach of contract. Plaintiff claims this is such a case. Its theory is based primarily on one authority. Atlas Brewing v. Huffman, 217 Iowa 1217, 252 N.W. 133 (1934). There the Iowa court held, on similar facts, that a party in default on a contract cannot cancel. Thus that Court held termination to have been ineffective and as such that defendant was liable for lost profits from future sales. While the Iowa court's position may be a viable one, nonetheless it is not controlling here since it does not represent Minnesota law, which this Court is constrained to follow.

■ The Minnesota position was carefully reviewed by the Circuit Court in Western Oil & Fuel Co. v. Kemp, 245 F.2d 633 (8th Cir. 1957). Therein Judge Nordbye's decision that the defendant's breach of its contract did not cause it to lose its right to terminate the contract and thus limit its damages was upheld.

> " 'The Court's conclusion is that [defendant] clearly had the right to cancel the contract . . . even though the contract had been breached prior to that date [by defendant].' " (Appellate Court adopting the trial court opinion.) At 641.

Thus the law in Minnesota does not allow future profits as damages under a contract terminable at will since termination automatically extinguishes the relationship between the parties regardless of what had been before. Plaintiff has been unable to distinguish Western Oil or show why it should not be applied here. This apparently being the most recent statement of Minnesota law, this Court must follow it.

■ Plaintiff had the burden of showing more than breach. In order to prevail in a breach of contract case, damages must also be proved. Here plaintiff offered no proof of damages occurring prior to termination. Evidence was only offered to show damage incurred after termination. Since the contract, as a matter of law, was terminable at will, and Minnesota law does not prohibit termination by one who has already breached the contract, it is axiomatic that damages for profits beyond the termination date are not recoverable. Howard v. Mercury Records, 178 F.2d 449 (5th Cir. 1949).

Therefore, since no damages were proved prior to termination, since the contract was terminable at will, and since the contract was effectively terminated, as a matter of law, the plaintiff suffered no damage due to a breach of the exclusivity provision of its contract with Hahn.

Judgment must be entered for the defendants on the exclusivity claim, notwithstanding the verdict of the jury.

### III. DEFAMATION OF CREDIT

■ The jury found that defendants had wilfully and maliciously defamed plaintiff's credit by making a false statement to Dun & Bradstreet,

---

2. One of plaintiff's experts, Lee Heutmaker, a certified public accountant, testified that had the business continued for five more years on an exclusive basis it would have earned, after taxes, $98,740.00; if it had continued seven more years $138,236.00; and if it had continued ten more years $197,480.00.

Inc., and awarded punitive damages in the amount of $3,500.00. The evidence viewed in the light most favorable to the plaintiff was sufficient for the jury to have concluded that an agent of Hahn knowingly made a false statement about plaintiff to Dun & Bradstreet, Inc., under circumstances where he knew the statement would be repeated. Since such a finding was possible from the evidence presented, and since punitive damages are allowed in defamation cases, the jury verdict was permissible. Furthermore, sufficient grounds for a new trial have not been established. Therefore, defendants' motions for a judgment notwithstanding the verdict or alternatively for a new trial will be denied.

## IV. RECOUPMENT

Plaintiff's third claim was for recoupment. The jury found that plaintiff had expended substantial sums of money in establishing a Hahn dealership network, and that Hahn had terminated the distributorship without just cause before plaintiff had had time to recoup its investment. As a result, plaintiff was awarded $104,086.00.

This Court is of the opinion that the evidence viewed in the light most favorable to the plaintiff was sufficient for the jury to have found that the distributorship was terminated without just cause before plaintiff had recouped its investment.

It should be noted that the "Spray Center" concept developed by Hahn envisioned a constantly evolving distribution network. The whole idea was that by providing more personalized service and advice, Hahn's product would be able to command a larger portion of the market than those dealers who just sold "hunks of iron." This marketing concept is essentially different from that of a person who opens a car dealership. There the initial investment is more easily calcula-

ble—so much for a building, inventory, etc. Here the whole concept of sales involved future service which would be provided to the farmer by the Spray Center. More so than in most businesses, building good will was essential here. Instead of merely selling a product, Ag-Chem was selling a service. Thus it is not unreasonable to envision that Ag-Chem's investment was continual rather than a lump sum.

■■ In light of this and in light of Dr. Mohring's and Mr. Heutmaker's uncontroverted testimony concerning the amount of plaintiff's expenditures for "future sales," the question of damages was a proper one for the jury despite the lack of exact figures as to the amount of investment. An exact computation of the amount invested is not required in Minnesota in order to be allowed to recoup. If the nature of the business is such that the exact amount invested is unascertainable, all that is necessary is a reasonable approximation of the investment. Emerson v. Pacific Coast & Norway Packing Co., 96 Minn. 1, 104 N.W. 573 (1905).

This Court also takes note of the fact that the defendants put in no evidence of their own. Thus it has no basis for determining that the amounts claimed by plaintiff as part of its investment are excessive. In light of all of the above, the jury was justified in awarding a verdict in this amount for the plaintiff.

## V. ROBINSON–PATMAN

Finally, the jury found that Hahn discriminated in price between plaintiff and Allis-Chalmers in such a way that competition might have been injured between the two. As a result, the jury found Hahn to be in violation of the Robinson-Patman Act, thereby damaging Ag-Chem in the amount of $91,192.00.[3]

Basically Ag-Chem proceeded on two different theories of injury under its Robinson-Patman claim. First it con-

---

3. Under the provisions of 15 U.S.C. § 15 a successful plaintiff in a case involving a Robinson-Patman Act violation is entitled to have his actual damages trebled. Here trebling increased Ag-Chem's award to $273,576.00.

tended that it was in direct competition with Allis-Chalmers, *i. e.*, second level competition. In the alternative, Ag-Chem claimed that its dealers were in direct competition with Allis-Chalmers dealers. Thus there was third level competition.

Hahn, on the other hand, strongly resisted both of these contentions and asserted that there could be no Robinson-Patman violation since there was no showing by plaintiff of injury to competition. They claimed that as a matter of law Allis-Chalmers and Ag-Chem were not in competition with each other since Allis-Chalmers' only sales were to its own dealers. Thus they claimed that Ag-Chem was really in competition with Allis-Chalmers dealers. As such there could be no price discrimination since Allis-Chalmers only passed on about 25% of its discount, as compared with the approximately 45% discount which Ag-Chem received from Hahn. Alternatively, they claimed that Ag-Chem's dealers could not have been in competition with Allis-Chalmers dealers since, in fact, Ag-Chem did not have any real dealers. Hahn claimed Ag-Chem's alleged dealers were in fact the ultimate consumers, since they primarily used the machines themselves rather than reselling them.

■ The Robinson-Patman claim was strenuously contested at trial and on motions after verdict by both sides. It raises difficult questions of law, and because of the unique relationship between Hahn, Ag-Chem, Ag-Chem's dealers, Allis-Chalmers, and Allis-Chalmers' dealers, this Court will be the first to admit it has been difficult to ultimately resolve. Largely because of the complexity of both the facts and the law, this Court was reluctant to grant defendants' motion for a directed verdict on all or part of the Robinson-Patman claim. It seemed best, in a situation like this where questions of law were close, to submit the claims to the jury, subject to the Court's subsequent opportunity to make a more detailed examination of the law on motions after verdict. This is in fact what was done. Now, after exhaustive briefing by both sides, and after careful study, this Court has determined that the damages are excessive, largely due to error in the instructions given the jury. Thus the jury's verdict cannot stand as entered. Montgomery Ward v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940). However, due to the amount of the Court's time and the clients' money already expended, an automatic grant of a new trial would not be expeditious, especially since the dual nature of plaintiff's theory of the Robinson-Patman Act damages appears to provide an effective vehicle for averting the necessity for a new trial.

It is the Court's opinion that for the reasons outlined below the plaintiff should remit all but $18,238.40 (before trebling) of its recovery under its Robinson-Patman Act claim. Only in the event plaintiff will not accept this solution shall a new trial be granted. Prochot v. Drew, 283 F.2d 904 (7th Cir. 1960). In the event there is a new trial on the Robinson-Patman claim it shall involve only the question of the existence and extent of Ag-Chem's dealers' competition with Allis-Chalmers' dealers, since the Court will hold, as a matter of law, that Ag-Chem and Allis-Chalmers were not in competition, with each other.

■ The threshold question here is, was there competition, since before there can be injury to competition as required under § 2(a) of the Robinson-Patman Act, there necessarily must be competition. In order to determine if there was competition, it is necessary not to look at categorizations made by the parties but at the "relevant competitive facts." F. T. C. v. Sun Oil Co., 371 U.S. 505, 527, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). Both parties have enumerated what they consider to be the "relevant competitive facts." While plaintiff contends that facts such as similarities in warehousing, advertising, and investment show that Allis-Chalmers and Ag-Chem perform the same functions and therefore are in competition, Hahn has

claimed that there is but one relevant competitive fact—"to whom does each resell?" Hahn's position is well supported. One commentator has said:

"In any event, the actualities of *competition in the resale* of the supplier's products rise superior to nominal customer categorizations. If particular customer classes do *not* compete in their resale operations, the supplier's price differentials between them cannot impair competition with the recipient of the lower price." Rowe, Price Discrimination Under the Robinson-Patman Act (1962), 176. (Emphasis in original.)

There is also ample case law so holding. See Knoll Associates, Inc., [1965–1967 Transfer Binder] Trade Reg.Rep. § 17, 668 at 22,952 (FTC 1966), rev'd and remanded on other grounds, 397 F.2d 530 (7th Cir. 1968); Sano Petroleum Corp. v. American Oil Co., 187 F.Supp. 345, 357 (E.D.N.Y.1960); Secatore's Inc. v. Esso Standard Oil, 171 F.Supp. 665 (D. Mass.1959); E. Edelman & Co., 51 F.T. C. 978, 984–985 (1955).

■ These cases and Hahn's approach are preferable to that taken by plaintiff. The whole thrust of the Robinson-Patman Act concerns protection of competition for resale. Merely because companies market or wholesale in a similar manner does not make them competitors. Competition is determined by careful analysis of each party's customers. Only if they are each directly after the same dollar are they competing.

■ When examined, it is apparent that Allis-Chalmers sold to customers which were completely unavailable to plaintiff. Allis-Chalmers never received a penny from a customer to which Ag-Chem could have sold, nor did it even deliver title to such a customer. Indeed, on the contrary, it sold to a closed class of purchasers, its own dealers, to whom Ag-Chem had no access whatsoever. This is not a case of different companies selling to the same customers by different methods. Rather it is like the *Edelman* and *Sano Petroleum* cases cited *supra*, where one distributor sold to a class of customers completely foreclosed to the other because of franchise control, not price control.

Finding that, as a matter of law, Allis-Chalmers and Ag-Chem did not compete with each other necessarily makes the instructions to the jury improper. However, the evidence and the reasonable inferences therefrom, viewed in the light most favorable to the plaintiff are sufficient to support a verdict in favor of the plaintiff on the theory that Ag-Chem had dealers who were in competition with Allis-Chalmers. In fact, the evidence was such that the jury could have concluded that up to 20% of plaintiff's business was with dealers who were in direct competition with Allis-Chalmers dealers.

In light of this, and in light of the time and expense already expended on this lawsuit, it seems the best course to reduce plaintiff's damages to 20% of the jury's verdict.[4]

Defendants apparently are not adverse to such a settlement, since in their initial memorandum in support of their

---

4. The measure of damages would have been the same regardless of whether the Ag-Chem–Allis-Chalmers competition claim had gone to the jury. Since the direct damage rule has been accepted in this Circuit, it must be applied by the District Courts. See Elizabeth Arden Sales Corp. v. Gus Blass Co., 150 F.2d 988 (8th Cir. 1945), cert. denied, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945).

Likewise, there is no problem of "pass through" here. On the secondary level the discrimination was 45%–55%. This was passed on to the dealers in similar terms. Ag-Chem dealers purchased for 15% off of list price while Allis-Chalmers dealers got approximately 25% off of list price.

motions for judgment notwithstanding the verdict and new trial they suggested such an apportionment. (See pp. 21–22).

## VI. ATTORNEYS' FEES

A successful Robinson-Patman Act plaintiff is entitled to reasonable attorneys' fees. 15 U.S.C. § 15. Plaintiff has suggested $60,000.00 would be reasonable. Defendants have objected and suggest $7,500.00 as an upper limit. Plaintiff's attorneys have presented records of their firm's billed hours totaling over $45,000.00; however, this represents total time spent on all of the claims involved in the lawsuit. Plaintiff is only entitled to its attorneys' fees for actual expenses incurred due to the Robinson-Patman Act aspects of the case. The Court recognizes it would be almost impossible to separate out the time spent on each separate claim. However, even in light of the complexities of this suit, $60,000.00 is excessive when compared with the original jury verdict. After considering those factors delineated in Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, 166 F.Supp. 163, 168–169 (E.D.Pa.1958), aff'd 273 F.2d 218 (3rd Cir. 1959); rev'd on other grounds, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), for use in determining an appropriate award of attorneys' fees in an antitrust action, this Court has decided that $18,000.00 is a reasonable fee in this case.

## VII. DISMISSAL AS TO HAHN, INC., A DELAWARE CORPORATION

Counsel for Hahn, Inc., a Delaware corporation, has appeared specially, seeking an Order vacating the judgment against Hahn, Inc. (Delaware). While at no time during trial did the Delaware corporation seek to exclude itself, even though it was represented, it nonetheless seems appropriate to vacate the judgment as to it at this time.

There is a judgment against Hahn of Delaware only because it acquired some of the assets of Kearney-National, Inc., which has absorbed Hahn, Inc., of Indiana. Since it is conceded that Kearney-National is a financially responsible corporation, able to respond to the judgment obtained in this action, there is no reason not to vacate the judgment against Hahn of Delaware.

## VIII. CONCLUSIONS OF LAW

1. On the claim of exclusivity (jury verdict for plaintiff in the amount of $98,740.00), the motion for judgment notwithstanding the verdict is granted. The alternative motion for a new trial is denied.

2. On the claim of defamation of credit (jury verdict for plaintiff in the amount of $3,500.00), the motion for judgment notwithstanding the verdict is denied. The alternative motion for a new trial is denied.

3. On the claim of recoupment (jury verdict for plaintiff in the amount of $104,086.00), the motion for judgment notwithstanding the verdict is denied. The alternative motion for a new trial is denied.

4. On the Robinson-Patman Act claim (jury verdict for plaintiff in the amount of $91,192.00), plaintiff will within thirty days hereof remit all but $18,238.40 (before trebling); otherwise defendants' motion for a new trial is granted. On re-trial the issues will be limited to the existence and extent of competition between Ag-Chem dealers and Allis-Chalmers dealers. If plaintiff accepts the remittitur, the sum of $18,238.40 will be trebled and judgment will be entered for $54,715.20, less the sum of $13,500.00 received by plaintiff from original defendant Allis-Chalmers Manufacturing Co. Defendants' motions for judgment notwithstanding the verdict or for a new trial except as stated herein are denied.

5. Judgment will be entered for plaintiff for attorneys' fees in the sum of $18,000.00 for prosecution of the Robinson-Patman Act claim.

6. The judgment against Hahn, Inc., a Delaware Corporation, is vacated and judgment for Hahn, Inc., a Delaware Corporation, will be entered.

7. The judgments to be entered will be entered against defendants Hahn, Inc., an Indiana Corporation, and Kearney-National, Inc., a Delaware Corporation.

Wherefore, in accordance with the above, it is ordered that the Clerk:

1. Set aside the judgment entered on June 3, 1971, in favor of plaintiff Ag-Chem Equipment Co., Inc., and against defendants Hahn, Inc., an Indiana corporation, Kearney-National, Inc., a Delaware corporation, and Hahn, Inc., a Delaware corporation in the sum of $479,902.00 with interest from April 22, 1971.

2. Enter judgment in favor of plaintiff Ag-Chem Equipment Co., Inc., a Minnesota corporation, in the sum of $107,586.00 with interest from April 22, 1971, against defendants Hahn, Inc., an Indiana corporation, and Kearney-National, Inc., a Delaware corporation.

3. If plaintiff accepts the remittitur on the verdict on the Robinson-Patman claim, then enter judgment in favor of the plaintiff in the sum of $54,715.20 less the sum of $13,500.00, together with interest from April 22, 1971, plus attorneys' fees in the sum of $18,000.00 against defendants Hahn, Inc., an Indiana corporation, and Kearney-National, Inc., a Delaware corporation.

4. Enter judgment in favor of Hahn, Inc., a Delaware corporation, and against plaintiff Ag-Chem Equipment Co., Inc., a Minnesota corporation.

5. Enter judgment on claim of exclusivity in favor of defendants Hahn, Inc., an Indiana corporation, and Kearney-National, Inc., and against plaintiff Ag-Chem Equipment Co., Inc., a Minnesota corporation.